UNITED STATES of America, Appellee,

v.

Paul N. HANKISH, and James L. Matthews, Appellants.

No. 73-1926.

United States Court of Appeals, Fourth Circuit.

Argued March 7, 1974.

Decided July 17, 1974.

Widener, Circuit Judge, concurred in part and dissented in part and filed an opinion.

Thomas A. Livingston, Pittsburgh, Pa. (Court-appointed counsel) (Dennis J. Clark, Pittsburgh, Pa., on brief), for appellants.

Wayne A. Rich, Jr., Asst. U. S. Atty. (John A. Field, III, U. S. Atty., and Robert B. King, Asst. U. S. Atty., on brief), for appellee.

Before CRAVEN, RUSSELL and WIDENER, Circuit Judges.

CRAVEN, Circuit Judge:

This is an appeal by Paul Hankish and James Matthews from convictions of crimes relating to a stolen interstate shipment of beer. Of the several questions presented, the most important are venue and the prejudicial effect of a newspaper article that appeared during trial.

According to the testimony most favorable to the prosecution, John Bruno and Jackie Longfellow stole a tractor-trailer rig loaded with 1,456 cases of Stroh's beer. The shipment was in transit from Detroit to a distributing company in Huntington, West Virginia. The next day defendant Hankish agreed to buy the beer from Bruno for $1.50 a case and asked Bruno to bring it from Huntington to Wheeling, West Virginia. Longfellow drove the truck rig to Wheeling, where he was met by Bruno and Matthews. Following their directions, Longfellow crossed the line into Ohio but the truck broke down on a steep hill. The beer was unloaded into rented trucks and taken back to Wheeling.[1] Even so, Hankish paid Bruno $2,000 for the beer.

Almost four years later, after Bruno and Longfellow had been convicted of federal crimes relating to the stolen shipment, a grand jury in the Southern District of West Virginia returned a three-count indictment against Hankish and Matthews. Count One charged a conspiracy to receive goods that had been stolen from an interstate shipment, to transport in interstate commerce stolen merchandise worth over $5,000, and to transport in interstate commerce a stolen motor vehicle.[2] Count Two

---

1. While Longfellow was engaged in transferring the stolen beer into the rented trucks an Ohio state patrolman stopped to offer assistance. No one can fault Longfellow for giving an affirmative reply when the officer asked whether the beer was hot.

2. This portion of the indictment referred not to the White tractor that had been stolen along with the beer-laden trailer, but to a stolen Mack tractor that Longfellow had used for the trip to Wheeling.

charged Hankish and Matthews with the substantive offense of transporting the beer in interstate commerce, knowing it to have been stolen, in violation of 18 U.S.C. § 659. Count Three charged Hankish with the substantive offense of transporting the stolen trailer in interstate commerce, knowing it to have been stolen, in violation of 18 U.S.C. § 2314. At trial the jury convicted defendants on all counts.

## I

■ Defendants contend that the Southern District of West Virginia was improper venue for the substantive crimes charged in Counts Two and Three. We have no difficulty sustaining venue on Count Three, which charged a violation of 18 U.S.C. § 2314. Venue under section 2314 is governed by the general provisions of 18 U.S.C. § 3237. United States v. DeKunchak, 467 F.2d 432 (2d Cir. 1972). Section 3237 (a) provides:

> Any offense involving the use of the mails, or transportation in interstate or foreign commerce, is a continuing offense and, except as otherwise expressly provided by enactment of Congress, may be inquired of and prosecuted in any district *from, through,* or *into* which such commerce or mail matter moves. (emphasis added).

The government's evidence supported the conclusion that the stolen trailer was transported, at the direction of Hankish, from the Southern District of West Virginia, through the Northern District of West Virginia, into the Southern Dis-

trict of Ohio. Thus venue would lie in any one of the three districts.

■ Count Two presents a harder problem. It was framed under 18 U.S.C. § 659, which contains a special venue provision applicable to the offense of transporting in interstate commerce any goods that have been stolen from an interstate shipment:

> [T]he offense shall be deemed to have been committed in any district into which such [stolen goods] shall have been removed or into which the same shall have been brought by such offender.

On its face, this language clearly authorizes venue in the Northern District of West Virginia and in Ohio but does not apparently embrace the Southern District of West Virginia where the illegal transportation originated.[3] The issue we face is whether this special venue provision comes within the "except as otherwise expressly provided by enactment of Congress" clause of section 3237. For the reasons that follow, we have concluded that section 659 was not intended to be an express exception and that section 3237 authorizes venue in the Southern District of West Virginia.

To begin with, the venue clause in section 659 is not couched in restrictive language. The Reviser's Notes to section 3237 mention only one statute—18 U.S.C. § 1073—as an instance "where Congress desires to restrict the prosecution of offenses to particular districts." Section 1073[4] is emphatically restrictive:

> Violations of this section may be prosecuted *only* in the Federal judicial

---

3. The only way of reading this language to produce venue in the district from which the goods were transported is to interpret "removed" as a reference to the asportation element of common-law larceny and to treat the preposition "into" as the equivalent of "in." This construction would authorize venue in the district in which the goods were stolen, but we think it too strained. The government has urged us to read "removed" in relation to the legal transportation of these goods from Detroit to Huntington, making the Southern District of West Virginia a district "into which the

goods were removed." This construction is even more strained. The crime is transportation of stolen goods, and the theft did not occur in Detroit or on the way to West Virginia.

4. Section 1073 prohibits travel in interstate commerce to avoid prosecution or confinement, to avoid giving testimony in criminal proceedings, to avoid service of process requiring attendance and testimony before a state investigatory agency, or to avoid contempt proceedings for disobedience of such process.

district in which the original crime was alleged to have been committed, or in which the person was held in custody or confinement or in which an avoidance of service of process or a contempt . . . is alleged to have been committed . . . . (emphasis added).

In contrast to the use of "only" in section 1073, section 659 employs the word "any."

The history of section 659 suggests that the venue clause was written with the intent of enlarging venue rather than restricting it. The first version of section 659 was enacted in 1913. Act of Feb. 13, 1913, ch. 50, 37 Stat. 670. The Supreme Court had recently approved the broad venue provision in the Elkins Act, ch. 708, 32 Stat. 847 (1903). There Congress had prohibited rebates, concessions, and discrimination in interstate railroad freight rates, and had provided:

Every violation of this section shall be prosecuted in any court of the United States having jurisdiction of crimes within the district in which such violation was committed, or through which the transportation may have been conducted . . . .

In Armour Packing Co. v. United States, 209 U.S. 56, 28 S.Ct. 428, 52 L.Ed. 681 (1908), the Supreme Court sustained this venue statute against constitutional challenge, holding that transportation is a "continuing offense" which may be punished "at the beginning, at the end, or in the middle of the journey," 209 U. S. at 74, 28 S.Ct. at 432.

Despite the breadth of the judicial authorization, between 1908 and 1913 the lower federal courts seemed reluctant to construe federal crimes as continuing offenses in the absence of special statutory language. For example, in Ex Parte Lair, 177 F. 789 (D.Kan.1910), rev'd on other grounds, 195 F. 47 (8th Cir. 1912), cert. denied, 229 U.S. 609, 33 S. Ct. 464, 57 L.Ed. 1350 (1913), and United States v. Capella, 169 F. 890 (N.D. Cal.1909), the courts had construed statutes prohibiting unlawful importation of aliens to create offenses that were complete at the port of entry. In *Capella* the court had explicitly held that the general venue statute [5] did not apply and that there was no venue in the district where the defendant was harboring an illegally imported alien. To make its intentions clear, Congress amended the immigration laws of 1910, specifically authorizing venue "in any district to or into which said alien is brought in pursuance of said importation by the person or persons accused." Act of Mar. 26, 1910, ch. 128, § 3, 36 Stat. 265 (now 8 U.S.C. § 1328). Enacted the same year, the Mann Act contained a similar clause to ensure that it would be construed to create a continuing offense. Act of June 25, 1910, ch. 395, § 5, 36 Stat. 826 (now 18 U.S.C. § 2421).[6]

5. Revised Statutes § 731 provided:
When any offense against the United States is begun in one judicial district and completed in another, it shall be deemed to have been committed in either, and may be dealt with, inquired of, tried, determined and punished in either district, in the same manner as if it had been actually and wholly committed therein.
This statute was incorporated into the 1911 judicial code as section 103. Act of Mar. 3, 1911, ch. 231, § 42, 36 Stat. 1100.

6. Congress followed the practice of drafting special "continuing offense" venue clauses up until 1948, when the current criminal code was enacted with section 3237 as a general definition of continuing offenses. *See* National Motor Vehicle Theft Act, ch. 89, § 5, 41 Stat. 325 (1919) ; National Stolen Property Act, ch. 333, § 6, 48 Stat. 795 (1934) (codified in 1948 as 18 U.S.C. §§ 2312 and 2314, respectively). The Supreme Court attached significance to the absence of special venue provisions. In United States v. Johnson, 323 U.S. 273, 65 S.Ct. 249, 89 L.Ed. 236 (1944), the Court held that the Federal Denture Act (which prohibited use of the mails for sending dentures made by unlicensed persons) did not create a continuing offense. The Court said:
It is significant that when Congress desires to give a choice of trial, it does so by specific venue provisions giving jurisdiction to prosecute in any criminal court of the United States through which a process of wrongdoing moves. . . . The absence of such a provision would in itself be significant.
*Id.* at 276, 65 S.Ct. at 251.

In this historical context we think it clear that the venue clause in section 659 was written with the intent of creating a continuing offense and thus multiplying the possible places of trial. The statute permitted venue in any district into which the stolen goods were removed or brought by the offender. It did not exclude other possibilities. Section 103 of the 1911 judicial code, which supplemented special venue provisions like that in section 659,[7] authorized venue in the district where an offense began and the district where it was completed. Together, the two statutes would have allowed prosecutions for transporting stolen goods between states to be brought in the district where the transportation began, the district where it ended, or in any district along the route. With this background it would be irrational to read section 659 restrictively.

The only circumstance that detracts from this analysis is the fact that the special venue clause was carried into the 1948 Code. Because section 3237 was written to make special venue clauses unnecessary, most such clauses were eliminated. The survival of the clause in section 659 might be taken to indicate that Congress meant to make section 3237 inapplicable.[8] The absence of legislative history on this venue clause, and the presence of other nonrestrictive venue clauses in the 1948 Code, lead us to believe that its retention was inadvertent. For example, section 659 itself contains another venue clause that pertains to the offenses of stealing, receiving, and possessing goods from an interstate shipment.[9] It clearly offers multiple choices of venue:

> The offense shall be deemed to have been committed not only in the district where the violation first occurred, but also in any district in which the defendant may have taken or been in possession of the said money, baggage, goods, or chattels.

This clause has been read, since 1948, as an expression of intent to make the crime a continuing offense. United States v. Cores, 356 U.S. 405, 411 n. 1, 78 S.Ct. 875, 2 L.Ed.2d 873 (1958) (Douglas, J., dissenting).

Moreover, in 1948 Congress amended section 659 to prohibit transportation of stolen interstate shipments in interstate or *foreign* commerce. If the venue provision is read to restrict venue to districts into which the goods are taken, there would be no venue for the crime of transporting stolen goods from Minnesota into Canada. Such a construction would nullify the clear intent of the amendment to cover transportation of stolen goods in foreign commerce—except for relatively few importation offenses. We do not think Congress intended such a result. *Cf.* United States

7. *Supra* note 4. *See* Mahaffey v. Hudspeth, 128 F.2d 940 (10th Cir.), cert. denied, 317 U.S. 666, 63 S.Ct. 76, 87 L.Ed. 535 (1942) (holding that § 103 supplemented special venue clause of National Stolen Property Act). Section 103 was carried over into the 1948 criminal code as the first clause of section 3237(a). It now reads:

Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.

8. The mystery is enhanced by the fact that a 1946 amendment to section 659 consolidated the venue clause relating to interstate transportation of stolen goods with the venue clause pertaining to the statute's other offenses, providing:

Prosecutions under this Act may be instituted in any district wherein the crime shall have been committed, or in which the offender may have taken, removed, brought or been in possession of said money, freight, express, baggage, goods, or property.

Act of July 24, 1946, ch. 606, § 1(g), 60 Stat. 657. This venue clause had a brief existence. Without explanation, the draftsmen of the 1948 code restored the language of the 1913 statute. If the occasion for change was an unfavorable judicial construction in the two-year interim, we have been unable to locate it.

9. *See also* 18 U.S.C. § 660.

v. Freeman, 239 U.S. 117, 36 S.Ct. 32, 60 L.Ed. 172 (1915).

Finally, we think the simple virtues of consistency support our conclusion that the venue clause was not meant to be restrictive. Section 2314, which prohibits interestate transportation of stolen property worth over $5,000, overlaps with this portion of section 659 whenever the goods stolen from interstate commerce are valued at $5,000 or more. In this case, the beer was worth $4,624, and the trailer was worth about $6,000. Consequently, the interstate transportation of the trailer violated both section 659 and section 2314; that of the beer violated only section 659. There is no reason in policy or logic for fixing venue in different districts, depending only on the value of the goods or the choice of the prosecutor. Because the offenses are virtually identical, it would be anomalous to attribute to Congress the intent of simultaneously restricting venue under section 659 and enlarging it under section 2314.

Whatever Congress' motive for retaining the special venue clause in section 659, we think it did not intend to create an express exception to section 3237. Consequently we hold that either section 659 or section 3237 may provide venue for an offense charged under the transportation clause of section 659. In this case, the prosecution was properly brought in the Southern District of West Virginia, the district in which the illegal transportation originated.

 We find no merit in appellants' contention that the Constitution allows venue only in the Southern District of Ohio. Their argument that no crime was committed until the beer crossed the state line is effectively answered in Armour Packing Co. v. United States, 209 U.S. 56, 28 S.Ct. 428, 52 L. Ed. 681 (1908). The crime, as defined by Congress, is not crossing a state line with stolen goods, but carrying or transporting stolen goods. *Cf.* Travis v. United States, 364 U.S. 631, 81 S.Ct. 358, 5 L.Ed.2d 340 (1961); Newton v. United States, 162 F.2d 795, 796 (4th Cir. 1947), cert. denied, 333 U.S. 848, 68 S.Ct. 650, 92 L.Ed. 1130 (1948). That it must be in interstate commerce is simply a jurisdictional peg without which the offense could not be tried in the federal courts but it is not, strictly speaking, an element of the criminal offense. The proposed revision of the federal criminal code makes this relationship explicit. Final Report of the National Commission on Reform of Federal Criminal Laws, Proposed New Federal Criminal Code § 201.

## II

On the second day of trial an article appeared in a newspaper in Charleston, where the trial was being held. In addition to fairly summarizing Jackie Longfellow's testimony from the first day, which could scarcely be prejudicial, the article described Hankish as a "Wheeling rackets figure" and reported:

> The theft was one of many instances stemming from a multistate theft ring that operated during the late 1960s.

> At the time the theft ring was broken up in 1969 by FBI agents, Hankish was described as having directed operations despite the loss of both legs five years earlier when his car was blown up in gangland fashion.

Defendants' Exhibit No. 2. Immediately after the noon recess, defense counsel asked the trial judge to interrogate the jurors individually to determine whether any of them had read the newspaper article or discussed it with other jurors. The district judge declined to do so.

 Appellants contend that the court's refusal to poll the jury was error. We agree and are compelled to order a new trial because of the possibility that the jury's verdict may have been influenced by the prejudicial newspaper article. The article speaks for itself. To put into the jury box an impression that Hankish was a racketeer and director of a multistate theft ring, and the implication that Matthews was a participant, is highly prejudicial.

■ The American Bar Association's Standards Relating to Fair Trial and Free Press include a recommendation that supports appellants' argument. Section 3.5(f) provides:

> If it is determined that material disseminated during the trial raises serious questions of possible prejudice, the court may on its own motion or shall on the motion of either party question each juror, out of the presence of the others, about his exposure to that material. . . . [A] juror who has seen or heard reports of potentially prejudicial material shall be excused if the material in question would furnish grounds for a mistrial if referred to in the trial itself.

We believe this recommendation has merit but goes too far. As to procedure we prefer the practice of the Seventh Circuit:

> Thus, the procedure required by this Circuit where prejudicial publicity is brought to the court's attention during a trial is that the court *must ascertain* if any jurors who had been exposed to such publicity had read or heard the same. Such jurors who respond affirmatively must then be examined, individually and outside the presence of the other jurors, to determine the effect of the publicity. However, *if no juror indicates*, upon inquiry made to the jury collectively, that he has read or heard any of the publicity in question, the judge is not required to proceed further. (emphasis added).

Margoles v. United States, 407 F.2d 727, 735 (7th Cir.), cert. denied, 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84 (1969). If any of the jurors have been exposed, the questioning procedure will open the way for appropriate corrective measures —cautionary instructions,[10] excusing individual jurors when alternates are available, or a mistrial if nothing else will cure the prejudice.[11]

As to remedy, we reject the ABA cure as both extreme and inflexible. That there may be ground for mistrial does not, we think, inevitably command that jurors be excused with resultant mistrial. What to do about the problem should remain in the sound·discretion of the district judge, and he should exhaust other possibilities before aborting a trial.

Here we cannot explore other curative devices because of the district judge's failure to lay open the extent of the infection. It is possible that none of the jurors had seen the article. Had it appeared that some or all had read it, it is also possible that colloquy with the court might have demonstrated that such jurors understood their duty to wholly disregard the prejudicial information and were mentally and emotionally capable of heeding the court's instruction to do so. But this is mere speculation. We agree with the Seventh Circuit that when highly prejudicial information may have been exposed to the jury, the court must ascertain the extent and effect of the infection, and thereafter, in its sound discretion, take appropriate measures to assure a fair trial. Margoles v. United States, 407 F.2d 727 (7th Cir. 1969); United States v. Accardo, 298 F.2d 133 (7th Cir. 1962). *See also* Mares v. United States, 383 F.2d 805 (10th Cir. 1967); Marson v. United States, 203 F.2d 904 (6th Cir. 1953).

■ We do not hold that every newspaper article appearing during trial requires such protective measures. Unless there is substantial reason to fear prejudice, the trial judge may decline to question the jurors. United States v. Wenzel, 311 F.2d 164, 170 (4th Cir. 1962); *see* Gordon v. United States, 438 F.2d 858 (5th Cir.), cert. denied, 404 U.S.

---

10. *See* United States v. Persico, 425 F.2d 1375 (2d Cir.), cert. denied, 400 U.S. 869, 91 S.Ct. 102, 27 L.Ed.2d 108 (1970).

11. *See* Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959).

828, 92 S.Ct. 139, 30 L.Ed.2d 56 (1971); United States v. Edwards, 366 F.2d 853, 873 (2d Cir. 1966), cert. denied, 386 U.S. 919, 87 S.Ct. 882, 17 L.Ed.2d 790 (1967).

### III

John Sauvogeot, one of the men who had helped unload the disabled truck, was called as a prosecution witness. He gave his name, age, and residence, and admitted his conviction for concealing the stolen beer, but claimed to remember nothing about the incident. To refresh his memory the United States attorney showed Sauvogeot the statement he had given the FBI in 1968. Although acknowledging that the signature looked like his, Sauvogeot denied any memory of making it. The United States attorney then proceeded, with permission of the court, to examine him as a hostile witness, questioning him at length about details of his prior statement. The following exchange is typical:

Q Did you tell the agents in September, 1968, "I returned to the Rock Garden Bar and sometime later Jacovetty called and said he had received a phone call that the stuff had arrived"?

A I don't remember that.

Q Well, did that happen?

A I don't remember whether it did or not.

Q Did you tell the agents that?

A I don't remember that either.

Tr. 267. Defense counsel waived cross-examination. The district judge instructed that wherever Sauvegeot said he did not remember, the jury could not consider the questions as evidence in the case.[12]

Appellants contend it was error to let the government cross-examine its own witness to such an extent. The result of the prosecution's tactic, they insist, was to give the jury inadmissible hearsay with nothing but an inevitably futile instruction to keep them from considering the signed statement.

■ This circuit follows the rule of Di Carlo v. United States, 6 F.2d 364 (2d Cir.), cert. denied, 268 U.S. 706, 45 S.Ct. 640, 69 L.Ed. 1168 (1925): "The latitude to be allowed in the examination of a witness, who has been called and proves recalcitrant, is wholly within the discretion of the trial judge." *Id.* at 368. Harman v. United States, 199 F.2d 34 (4th Cir. 1952); Walker v. United States, 104 F.2d 465 (4th Cir. 1939). It is settled in this circuit that the trial judge may allow questioning based on prior statements, whether inconsistent, impeaching, or for the purpose of authenticating past recorded recollection.

■ Observing Sauvogeot's demeanor, the district judge was convinced that he was "evading answering questions that he could answer truthfully." His belief was reasonable and under such circumstances it was reasonable to allow the prosecutor to go over the prior statement question by question in the presence of the jury.

### IV

As to appellants' other assignments of error, we offer the following brief comments for guidance upon retrial.

■ We think the record contains sufficient evidence to support the verdict. The judge's charge on the elements of conspiracy was sufficiently related to the specific acts charged in the indictment. The charge of aiding and abetting was authorized by United States v. Duke, 409 F.2d 669 (4th Cir. 1969), cert. denied, 397 U.S. 1062, 90 S.

---

12. Although the rule in this circuit prohibiting the use of prior statements as substantive evidence remains unchanged, *see* United States v. Payne, 492 F.2d 449 (4th Cir. 1974), we note that the proposed rules of evidence currently being considered by Congress would remove prior inconsistent statements from the hearsay rule. Proposed Federal Rules of Evidence 801(d)(1). In California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), the Supreme Court upheld the constitutionality of a similar state rule.

Ct. 1497, 25 L.Ed.2d 683 (1970). Hankish's contention that he could rest his own case and then be entitled to testify for Matthews with the assurance that his testimony could not be considered against him is wholly without merit.

Since there must be a new trial, we need not discuss the failure of the district court to reveal the contents of the presentence report. *But see* United States v. Johnson, 495 F.2d 377 (4th Cir. 1974); Baker v. United States, 388 F.2d 931 (4th Cir. 1968); Fed.R.Crim. P. 32(c)(3), as amended, 42 U.S.L.W. 4557 (1974).

We have some doubts about the admission of Bruno's testimony that he had made "four or five" other deals with Hankish on stolen property. It is not clear on this record that the rationale of United States v. Baldivid, 465 F.2d 1277 (4th Cir.), cert. denied, 409 U.S. 1047, 93 S.Ct. 519, 34 L.Ed.2d 499 (1972), and United States v. Mastrototaro, 455 F.2d 802 (4th Cir.), cert. denied, 406 U.S. 967, 92 S.Ct. 2411, 32 L.Ed.2d 666 (1972), applies.

Reversed and remanded for a new trial.

WIDENER, Circuit Judge (concurring and dissenting):

While I concur with the majority to a considerable extent, I am respectfully unable to agree that the venue provisions of 18 U.S.C. § 659, as applicable to the offense of carrying or transporting such stolen goods in interstate commerce, are not to be read literally, or that the prosecution's cross-examination of witness Sauvogeot, by use of a prior statement which he could not remember making, was proper.

Since, as the majority points out, Count Two was an indictment under the "separate offense" provision of § 659, I think it should have been tried under the venue provisions of the very statute which created the crime. The venue provisions of the statute creating the crime are clear, the words used being "shall be deemed to have been commit-ted." I am further of opinion that this is an express exception to 18 U.S.C. § 3237. I am unable to see how Congress may create an exception unless to act as it has here.

I am of opinion the district court erred in allowing the reading of the statement of the witness Sauvogeot to him in the presence of the jury, and then instructing the jury to disregard the questions. Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965); Roberts v. Russell, 392 U.S. 293, 88 S.Ct. 1921, 20 L.Ed.2d 1100 (1968); Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

I share the doubts of the majority as to the admissibility of the testimony of Bruno concerning other crimes of the accused, and would go further. I think the evidence inadmissible under Lovely v. United States, 169 F.2d 386 (4th Cir. 1948).